Peradotto, J.
(dissenting). I respectfully dissent. In my view, defendants-appellants (defendants) met their initial burden of establishing the absence of medical malpractice on their respective motions for summary judgment dismissing the amended complaint and all cross claims against them, and plaintiff failed to raise a triable issue of fact in opposition to the motions. I would therefore reverse the order, grant the motions, and dismiss the amended complaint and all cross claims against defendants.
This matter arises from the care and treatment rendered to Steven R Wilk (decedent) during four hospital visits that occurred over a period of six days in February 2004, which culminated in his admission to the hospital on February 18, 2004 and his death two weeks later.
On February 13, 2004, decedent was transported via ambulance to the emergency room at defendant Kaleida Health, doing business as Millard Fillmore Health System-Three Gates Circle Hospital (Kaleida). According to the ambulance record, decedent complained of lower back pain that began two days earlier and became “severe about 9:30” that morning. He reported experiencing some relief with pain medication. Decedent was triaged at the hospital shortly after 11:00 a.m., and complained of sharp, constant pain in his lower back that increased with movement and radiated down both legs. His prior medical history included coronary artery disease, coronary artery bypass graft surgery, aortic valve replacement, and hypertension. Decedent’s medications included Coumadin, an anticoagulant that was prescribed after his open heart surgery, and Lisinopril, which was prescribed to treat heart disease and hypertension.
*1488 At approximately 11:35 a.m., decedent was assessed by a nurse practitioner who was working under the supervision of defendant David M. James, M.D. The nurse practitioner’s notes indicate that decedent “complain[ed] of back pain which started suddenly two days ago after turning suddenly.” Decedent rated his pain as an 8 out of 10 on the pain scale, and indicated that it increased with movement and radiated down both legs. Decedent reported that he had taken pain medication at 9:30 a.m., which had resulted in some relief, but that his pain persisted. His “review of systems” was negative except for back pain, and his physical examination was normal.
The nurse practitioner ordered that decedent be given intravenous administration of pain medication, Prothrombin Time and International Normalized Ratio (PT/INR) testing to rule out an epidural bleed, and a thoracic spine X ray to rule out a fracture. Decedent’s INR level was “slightly . . . sub therapeutic,” meaning that he was not at an increased risk of bleeding. The X ray revealed moderate degenerative changes in decedent’s thoracic spine, osteopenia, and “anterior wedging of T9 and LI vertebral bodies.” By 12:00 p.m., decedent was walking without difficulty, and he reported that the pain medication had an “excellent effect” and that his pain level was a 1 out of 10. He was discharged shortly thereafter with a diagnosis of thoracic strain, and was directed to follow up with his primary care physician within three to four days and to return to the hospital if his symptoms worsened or if he experienced loss of bladder or bowel control, which could indicate a neurological problem.
Two days later, on February 15, 2004, decedent returned to Kaleida complaining of lower back pain that radiated into his legs and was evaluated by Dr. James. Decedent reported that the pain medication and muscle relaxer that had been prescribed at the prior hospital visit “[p]rovided relief,” but that on February 15 “[he] felt he had more pain into both upper thighs.” Dr. James’s review of systems was negative with the exception of back pain and, upon physical examination, Dr. James determined that decedent was in no acute distress and exhibited no sensory deficits. Dr. James noted possible diagnoses of sciatica or kidney stones. Decedent was discharged shortly thereafter with a prescription for a steroid to reduce inflammation. At the time of discharge, decedent reported a pain level of 3 out of 10, and his condition was described as stable.
While waiting for his wife to pick him up, decedent complained of sudden right flank and left abdominal pain. Dr. James ordered urinalysis and a CT scan of decedent’s abdomen and pelvis, *1489 without contrast, to check for kidney stones. The CT scan revealed, inter alia, “[a] unilaterally enlarged left kidney with perinephric stranding”; atherosclerotic changes in the aortic, iliac, and femoral arteries; and a “[l]arge urinary bladder with mildly enlarged prostate, suggestive of outlet obstruction.” As a result, Dr. James ordered that decedent have a Foley catheter inserted, after which 1,400 cubic centimeters of urine were released. Shortly thereafter, decedent reported that he “felt well,” and he was discharged with a direction to follow up with his primary care doctor within one to two days.
The next day, decedent complained to his treating urologist that he was unable to urinate. Because it was after business hours, the urologist instructed decedent to go to the hospital to have a Foley catheter inserted. Decedent arrived at defendant Mercy Ambulatory Care Center, Inc., a member of defendant Catholic Health System (collectively, Mercy/CHS), at approximately 7:00 p.m. on February 16, 2004. Decedent told the triage nurse that he had been unable to urinate for more than 24 hours, and he reported a prior medical history of urinary retention. He further complained of pressure in his, suprapubic area. Decedent was hemodynamically stable, with the exception that his blood pressure was elevated. Within 10 minutes of decedent’s arrival at Mercy/CHS, a nurse inserted a Foley catheter and 1,000 cubic centimeters of urine were released.
Decedent was thereafter evaluated by defendant Sadir Alrawi, M.D., an employee of defendant Buffalo Emergency Associates, LLE Dr. Alrawi’s notes indicate that decedent was a “known case of BEH [benign prostatic hyperplasia],” i.e., enlarged prostate, and that he had been catheterized at Kaleida the day before. Decedent complained of severe pain in his, suprapubic area — the area above his bladder — and an inability to urinate. Dr. Alrawi spoke to the on-call physician in the office of decedent’s treating urologist, who indicated that decedent should remain catheterized and follow up with his urologist. Following catheterization, decedent’s blood pressure returned to normal. He was discharged at 10:30 p.m. in an “improved” condition and was instructed to “follow-up with [his urologist] in [the] morning.”
Decedent did not follow up with his urologist as directed. On February 18, 2004, decedent returned to Kaleida complaining of increased lower back pain that radiated into both legs and an inability to move his legs. Upon evaluation, decedent reported a fever, fatigue, back and neck pain, paresthesias, gait disturbance, and focal weakness. Decedent was admitted to the hospital under the care of a neurosurgeon with a principal diag *1490 nosis of paraplegia and. secondary diagnoses of spinal hematoma and infarct, coagulopathy (bleeding disorder), and rheumatic heart disease. Decedent had a significantly elevated INR level, and he was treated with vitamin K and fresh frozen plasma. MRIs of decedent’s spine, which were performed with and without contrast, revealed “extensive intraspinal signal abnormality suggesting an extensive hemorrhage.” That evening, decedent underwent a laminectomy in order to evacuate intradural clots in his thoracic and lumbar spine.
After the surgery, decedent experienced “transient improvement and then subsequently the loss of function bilaterally.” Imaging revealed “cord signal changes most consistent with swelling or infarction” and “an area of residual clot at the T10-11 level on the left-hand side, as well as an area within the [spinal column] and about the L3 level with suggestion of mass effect.” As a result, decedent underwent a second surgery on February 20, 2004 for a reevaluation of his thoracic and lumbar spine, and further removal of subdural hematomas. Progress notes indicate that decedent improved somewhat after the second surgery and that decedent was to be transferred to a spinal cord rehabilitation center. On March 1, 2004, however, decedent became acutely disoriented and short of breath. A pulmonary embolism was suspected, and a head and chest CT scan with contrast was ordered. The CT scan ruled out a pulmonary embolism, but revealed an aortic dissection. There was, however, no hematoma, rupture, or leak around the aorta. A cardiothoracic surgery consult note states that decedent’s altered mental status likely resulted from “a thrombus (blood clot) on his mechanical aortic valve causing a small cerebral embolus.” The blood clot, in turn, resulted from a “lack of anticoagulation. ’ ’
Decedent’s condition deteriorated over the next two days, and he died on March 3, 2004. The death certificate lists the immediate cause of death as “cerebral infarct with herniation” occurring within “hours” of decedent’s death. The cerebral infarct was “due to or as a consequence of” shock with intestinal ischemia beginning “days” before decedent’s death which, in turn, was “due to or as a consequence of” aortic dissection, which likewise began “days” prior to decedent’s death. The certificate also lists “spinal cord infarct [secondary to] hematoma” as another “significant condition contributing to death but not related to” the other listed causes.
Plaintiff commenced this medical malpractice and wrongful death action seeking damages for decedent’s wrongful death and conscious pain and suffering. In her bills of particulars, *1491 plaintiff broadly alleged that defendants were negligent in, inter alia, failing to adequately assess and monitor decedent, failing to properly examine and test decedent in a timely manner, and failing to properly diagnose decedent’s condition.
After discovery, defendants moved for summary judgment dismissing the amended complaint and all cross claims against them. As plaintiff correctly conceded below, each of the defendants met their initial burden on their respective motions of establishing “either the absence of any departure from good and accepted medical practice or that any departure was not the proximate cause of [decedent]’s alleged injuries” (Shichman v Yasmer, 74 AD3d 1316, 1318 [2010]; see O’Shea v Buffalo Med. Group, P.C., 64 AD3d 1140, 1140 [2009], appeal dismissed 13 NY3d 834 [2009]). Each defendant submitted the affidavit of an expert in which the expert opined that defendants did not deviate from accepted medical practice in their care and treatment of decedent, and that any acts or omissions on their part did not cause or contribute to decedent’s death (see Lake v Kaleida Health, 59 AD3d 966, 966 [2009]; Darling v Scott, 46 AD3d 1363, 1364 [2007]). In their affidavits, the experts directly addressed each of the allegations of negligence in plaintiffs bills of particulars (see Abbotoy v Kurss, 52 AD3d 1311, 1312 [2008], lv denied 55 AD3d 1421 [2008]), and their opinions were supported by decedent’s medical records and the deposition testimony of the medical professionals who treated decedent (see Alvarez v Prospect Hosp., 68 NY2d 320, 325 [1986]).
For example, with respect to the treatment rendered at Kaleida on February 13 and 15, 2004, Dr. James submitted the affidavit of a physician who is board certified in emergency medicine. In the affidavit, the expert opined that the diagnosis of thoracic strain on February 13, 2004 was appropriate based on decedent’s presentation, symptoms, and X ray results. The expert noted that decedent’s pain improved significantly upon the administration of non-narcotic pain medications — decedent had a pain level of 8 out of 10 upon arrival and a pain level of 1 out of 10 upon discharge — and that he was walking without difficulty at the time of discharge. Decedent’s INR level was “subtherapeutic,” indicating that he was “not at risk for complications arising from the use of anticoagulation medication, such as bleeding.” Dr. James also submitted the deposition testimony of the nurse practitioner who treated decedent on February 13, 2004. The nurse practitioner stated that decedent “presented with a classic history for muscle spasms,” i.e., a sharp, sudden onset of pain that was constant and increased with movement.
*1492 As for the treatment rendered on February 15, 2004, the expert for Dr. James noted that decedent’s neurological examination was normal, and that Dr. James properly referred to and relied upon decedent’s INR reading from February 13. According to the expert, the symptoms decedent experienced on February 15 — urinary retention, flank pain, and abdominal pain — are consistent with a diagnosis of kidney stones and that a CT scan without contrast is the proper test to confirm or rule out such a diagnosis. The expert opined that decedent’s CT scan results were also consistent with a diagnosis of kidney stones inasmuch as the scan showed an enlarged left kidney, which is indicative of a “recent obstruction.” According to the expert, decedent’s “presentation” on February 15, 2004 was “not consistent with an epidural hematoma or aortic dissection.”
Additionally, with respect to the treatment rendered to decedent on February 16, 2004 at Mercy/CHS, Dr. Alrawi submitted the affidavit of a physician who is board certified in emergency medicine. The expert opined that it was reasonable for Dr. Alrawi to conclude, based upon decedent’s stated history and his physical examination, that decedent’s, suprapubic pain was the result of urinary retention related to BPH. The expert noted that, after catheterization, decedent’s blood pressure returned to normal. The expert opined that, based on decedent’s clinical presentation, his history, and the medications he reported taking, there was no reason for Dr. Alrawi to suspect bleeding or a spinal hematoma. The expert further opined with a reasonable degree of medical certainty that “the spinal hematoma that was diagnosed on February 18, 2004 most likely formed quickly and was not present at the time [decedent] was seen by Dr. Alrawi.” The expert noted that a pathology report generated from a specimen obtained during decedent’s February 18, 2004 laminectomy described an “organizing” blood clot, but did not indicate the presence of “old blood.” In the expert’s opinion, the pathology results indicate that it was “unlikely” that the spinal hematoma discovered on February 18, 2004 was present 48 hours earlier when decedent was seen at Mercy. The expert thus opined that it was reasonable for Dr. Alrawi to diagnose decedent with urinary retention; to treat that condition with catheterization, antibiotics, and pain medication; and to instruct decedent to follow up with his treating urologist. Indeed, Dr. Alrawi testified at his deposition that the most common cause of urinary retention is a prostatic condition, i.e., BPH.
Thus, inasmuch as defendants met their initial burden on their respective motions, the burden shifted to plaintiff to “raise *1493 triable issues of fact by submitting a physician’s affidavit both attesting to a departure from accepted practice and containing the attesting [physician’s] opinion that the defendant^’] omissions or departures were a competent producing cause of the injury” (O’Shea, 64 AD3d at 1141 [internal quotation marks omitted]; see Moran v Muscarella, 85 AD3d 1579, 1580 [2011]). It is well established that “[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat defendant^’] . . . summary judgment motion[s]” (Alvarez, 68 NY2d at 325). Thus, “[w]here the expert’s ultimate assertions are speculative or unsupported by any evidentiary foundation, . . . [his or her] opinion should be given no probative force and is insufficient to withstand summary judgment” (Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002]).
Supreme Court concluded, and the majority agrees, that plaintiff raised a triable issue of fact in opposition to the motions. I disagree. In my view, the opposing affidavits of plaintiffs expert were conclusory and did not directly address or refute the prima facie showing in the detailed affidavits of defendants’ experts (see Foster-Sturrup v Long, 95 AD3d 726, 728-729 [2012]). Moreover, plaintiffs expert relies upon a series of vague and speculative assumptions, which are unsupported or contradicted by the record.
The crux of the opinion of plaintiffs expert is that on February 13, 15, and 16, 2004, i.e., the dates of the alleged negligence herein, decedent was suffering from a “thoracic and abdominal aortic dissection,” and that the undetected aortic dissection caused the cascade of medical events commencing with decedent’s admission to the hospital on February 18, 2004 and terminating with his death several weeks later. Plaintiffs expert opines that defendants’ failure to diagnose that condition in a timely manner “deprived [decedent] of a chance at timely intervention for treatment of his aortic dissection before the vessel started to hemorrhage,” and that “[appropriate and timely emergency intervention would have, more probably than not, identified the presence of a dissecting thoracic and abdominal aorta which could have been surgically treated before causing spinal cord injury.”
There is simply nothing in the medical records, however, to support the opinion of plaintiff’s expert that decedent’s symptoms on the dates at issue and his subsequent injuries were caused by a ruptured aortic dissection. The voluminous medical records contain only two references to an aortic dissec *1494 tion, neither of which are specifically referred to in the affidavit of plaintiffs expert: (1) a cardiothoracic surgery consultation note dated March 1, 2004; and (2) decedent’s death certificate. On March 1, 2004, which was more than two weeks after defendants’ alleged negligence, decedent suddenly became disoriented and short of breath. As a result, decedent underwent a CT scan of his head and chest, with contrast, for the purpose of ruling out a suspected pulmonary embolism. No report from that CT scan appears in the record. According to a handwritten cardiothoracic consultation note, however, the CT scan revealed an aortic dissection. The majority relies upon the first part of the note, which states that a non-contrast CT scan performed approximately two weeks earlier shows “calcification at the center of the aorta at [approximately] diaphragmatic level. This suggests the dissection is old (at least to 2/15),” i.e., the date of the prior CT scan. The remainder of the note, however, concludes that there was “no hematoma, rupture or leak around the aorta” and, indeed, that there was “[n]o evidence of rupture/ impending rupture.” That statement undercuts the theory of plaintiffs expert that plaintiffs injuries were caused by a hemorrhage or rupture of the aorta. Indeed, the note proceeds to state that the aortic dissection was “probabl[y] old . . . , most likely occurring” after decedent’s 2002 aortic valve replacement surgery. According to the note, decedent’s altered mental state likely resulted from a cerebral embolus caused by a thrombus, i.e., a blood clot, on decedent’s mechanical aortic valve, which in turn resulted from a lack of anticoagulation therapy. Plaintiffs expert fails to address that information. The only other reference to an aortic dissection is found in the death certificate, which lists “aortic dissection” as one of the secondary causes of death. According to the death certificate, however, that condition existed for only a period of “days” prior to decedent’s death on March 3, 2004, which contradicts the conclusion of plaintiffs expert that decedent suffered from an aortic dissection as early as February 13, 2004. Further, the death certificate lists “spinal cord infarct [secondary to] hematoma” — the condition for which decedent was admitted to the hospital on February 18, 2004 — as another “significant condition contributing to death but not related to” (emphasis added) the primary and secondary causes of death, including the aortic dissection.
Even assuming, arguendo, that decedent’s injuries and death were caused by a rupturing aortic dissection and that such condition was present on the relevant treatment dates, it is my view that plaintiff’s expert failed to set forth an evidentiary basis for his or her opinion that defendants should have diagnosed the alleged aortic dissection on those dates (see Bendel *1495 v Rajpal, 101 AD3d 662, 663-664 [2012]; Altmann v Molead, 51 AD3d 482, 483 [2008]; Holbrook v United Hosp. Med. Ctr., 248 AD2d 358, 358-359 [1998]). As noted above, an aortic dissection was not “diagnosed” until March 1, 2004, which was 13 days after decedent was admitted to the hospital. During those 13 days, decedent underwent two spinal surgeries, received MRIs with and without contrast of his lumber, cervical, and thoracic spine, and was under the constant care of a neurosurgeon, yet there is no mention in the medical records of an aortic dissection or a dissecting aortic aneurysm during that period. Plaintiff s expert nonetheless concludes that a “[r]eview of all of [decedent’s] records confirms that the true cause for the onset of [his] back pain was an aortic dissection.”
In support of that conclusion, plaintiff’s expert focused on what he or she characterized as a “discrepancy” between the patient history documented on the February 13, 2004 ambulance record and the patient history recorded by Kaleida staff on that date — a characterization that is adopted by the majority. Specifically, plaintiffs expert stated that the Kaleida nurse practitioner ruled out a differential diagnosis of aortic dissection “solely on the basis of an erroneous description of the patient’s true history,” which resulted in a series of errors culminating in decedent’s “premature[ ] discharge[ ] on an erroneous diagnosis of thoracic muscle strain.” The expert’s opinion, however, is based upon the faulty premise that decedent’s pain began only 90 minutes prior to his arrival at the emergency room, i.e., at 9:30 a.m. on February 13, 2004. The majority similarly states that decedent’s back pain “started at 9:30 a.m.” That statement, however, is based upon a misreading of the ambulance record. In fact, the ambulance record states that decedent’s pain became “severe about 9:30 [a.m.]” (emphasis added). In the “comments” section of the ambulance record, the paramedic further indicated that decedent’s pain “started [two] days ago.” Thus, when read in its entirety, the ambulance record indicates that decedent’s back pain began two days before his first emergency room visit, i.e., on February 11, 2004, and that it increased in intensity on the morning of February 13, 2004, thereby prompting that hospital visit. Indeed, plaintiff’s own bills of particulars unequivocally state that decedent’s pain began on February 11, 2004.
The nurse practitioner testified at her deposition that, in her experience, patients who “have had a dissecting aneurysm, do not have pain for two days prior to ending up in an emergency room.” That testimony was undisputed. In any event, contrary to the assertion of the majority, the nurse practitioner did not *1496 rule out an aortic dissection solely on the basis of the reported duration of decedent’s pain. Rather, the nurse practitioner testified at her deposition that she excluded an abdominal aortic aneurysm based upon her physical examination of decedent, decedent’s description of his pain, and the fact that decedent’s pain was relieved by the course of treatment that she prescribed. Decedent reported that the pain began when he turned suddenly, and he described the pain as a sharp, constant pain that increased with movement and radiated into his legs, which the nurse practitioner described as “very spasmatic sounding in nature.” By contrast, the nurse practitioner testified that patients suffering from a dissecting aneurysm describe the sensation as a “ripping-like pain and not a sharp, sudden onset [of] pain,” and that those patients generally have pain in other areas of their body. Upon physical examination, decedent was in no acute distress and exhibited no neurological or cardiovascular symptoms. Significantly, decedent’s abdominal examination was normal with no tenderness or abnormal vascular sounds, including within the aortic vessel. Further, decedent responded well to non-narcotic pain medication, which the nurse practitioner testified was inconsistent with an aortic dissection. Finally, the nurse practitioner testified that decedent’s thoracic spine X ray supported her diagnosis. Significantly, plaintiff’s expert did not dispute any of that information.
With respect to the treatment rendered to decedent on February 15, 2004, plaintiffs expert concludes that Kaleida deviated from the relevant standard of care in failing to order a CT scan with contrast based upon decedent’s “constellation of signs and symptoms.” Notably, plaintiffs expert does not opine that the alleged “constellation” of symptoms warranting a CT scan with contrast were signs of an aortic dissection or that a CT scan with contrast performed on that date would have revealed such a dissection. In any event, many of the “signs and symptoms” plaintiffs expert relies upon are simply not supported by the record. For example, the expert averred that decedent had “no history of back trauma” when, in fact, decedent reported that his back pain began when he turned suddenly on February 11, 2004. Also, contrary to the expert’s assertion that decedent’s “pain was not relieved by prescription pain medications over the preceding [48] hours,” the record establishes that decedent’s pain improved significantly following the administration of pain medication on February 13, 2004 and February 15, 2004. Finally, plaintiffs expert concluded that a CT scan with contrast was indicated because the non-contrast scan “had ruled-out obstructive kidney stones.” Dr. James’s expert, however, opined that the CT scan findings suggested a “probable kidney stone” and *1497 noted that the report referenced an enlarged left kidney, which is consistent with a recent obstruction. Plaintiff also failed to refute that opinion.
Finally, with respect to the treatment rendered at Mercy/CHS on February 16, 2004, plaintiff’s expert opined that “from a comprehensive review of all of the other records of [decedent]’s treatment, it is clear that, at the time of his [Mercy/CHS] visit, [decedent] was experiencing a thoracic and abdominal aortic dissection. At the two (2) preceding ER visits, he had complained of intractable severe low back pain which is entirely consistent with his severe dissection. But, the [Mercy/CHS] record is devoid of documented physical findings suggestive of this condition. It is inconceivable that this evolving condition did not continue to cause detectable problems for [decedent] on February 16, 2004. When [the Mercy/CHS defendants] made no findings consistent with this problem, and, when all of them remained oblivious to this underlying condition, these facts more likely support a conclusion that the examinations were not properly performed, than that the condition had become asymptomatic. ’ ’
As discussed in detail with respect to the Kaleida defendants, plaintiffs expert provides no basis for the hindsight determination that decedent was in fact suffering from an aortic dissection on February 16, 2004. Further, plaintiff’s expert faults Mercy/CHS for failing to document findings consistent with that condition, i.e., “intractable” back pain, when there is no evidence that decedent had or complained of back pain on that date. Instead, the records reflect that his primary complaint was urinary retention and pain or discomfort in his, suprapubic region. Unlike his visits to Kaleida on February 13 and 15, 2004, decedent went to Mercy/CHS as a walk-in patient, upon the direction of his treating urologist, for the purpose of having a Foley catheter inserted in order to relieve his complaints of urinary retention. As noted, at the time of his Mercy/CHS visit, decedent was hemodynamically stable, but for the fact that his blood pressure was elevated before he was catheterized. After the catheter was inserted and 1,000 cubic centimeters of urine were released, decedent’s blood pressure returned to normal and his condition improved. Following a consultation with decedent’s urologist, Mercy/CHS discharged decedent with the catheter in place and instructed him to follow up with the urologist the next day. Decedent did not do so. Thus, contrary to the opinion of plaintiffs expert, there was nothing to suggest that decedent was suffering from an aortic dissection at that time.
In sum, as the court found and plaintiff concedes, defendants established as a matter of law that they did not deviate from *1498 the standard of emergency medical care on February 13, 15, or 16, 2004 and that, in any event, any alleged deviations did not cause decedent’s subsequent injuries and his death more than two weeks later. In opposition to the motions, plaintiff submitted the affidavit of an expert in which the expert made conclusory assertions of negligence and proximate cause, which were either unsupported by or contradicted by the record, and thus failed to raise a triable issue of fact (see Holbrook, 248 AD2d at 358-359; see also Mignoli v Oyugi, 82 AD3d 443, 444 [2011]; Altmann, 51 AD3d at 483; Hernandez-Vega v Zwanger-Pesiri Radiology Group, 39 AD3d 710, 711-712 [2007]). I would therefore reverse the order, grant defendants’ respective motions for summary judgment, and dismiss the amended complaint and all cross claims against them (see Moran v Muscarella, 87 AD3d 1299, 1300 [2011]). Present — Smith, J.P., Peradotto, Carni, Lindley and Martoche, JJ.